# Estate of Robert Murdock—Appeal of Margaret Raisner.

*Marriage—Common law marriage—Contract—Words in the present tense—Cohabitation and reputation—Claim of alleged widow of decedent.*

In an adjudication of an auditor's report distributing the estate of a decedent, the alleged widow testified that a marriage contract was entered into between herself and decedent in the following manner: "He said 'Will you be good to me?' I said 'Yes, I will do every thing that a wife is supposed to do.' Well, we just decided then to say we were married and let it go at that." There was evidence of cohabitation and reputation.

Such words, without an averment in words in the present tense, that they did marry each other, were insufficient to establish a valid contract of marriage, although there was evidence of cohabitation and reputation.

Marriage is in law a civil contract, but it must be evidenced by words of the present tense, uttered with a view and for the purpose of establishing the relation of husband and wife. In civil cases reputation and cohabitation are admitted as evidence of an actual marriage, not as constituting themselves a legal marriage. Where the testimony of the surviving party as to the terms of the contract shows that there was no contract by words in presenti, all other evidence on the subject is of no importance.

Argued December 13, 1927. Appeal No. 381, October T., 1927, by administratrix from decree of O. C. Philadelphia County, April T., 1926, No. 1250, in the estate of Robert Murdock. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Reversed.

Exceptions to adjudication. Before STEARNE, J.

The facts are stated in the opinion of the Superior Court.

Exceptions dismissed. Administratrix appealed.

*Error assigned* was the decree of the court.

*George P. Orlady,* and with him *Paul C. Hamlin,* for appellant.—Definite words of mutual acceptance are

necessary to establish a marriage contract: Nathan's Case, 2 Brewster 149; Vincent's Appeal, 60 Pa. 236; Greenawalt v. McEnally, 85 Pa. 352; Drinkhouse's Estate, 151 Pa. 294; Luce's Estate, 3 Pa. Superior Ct. 289; Comly's Estate, 185 Pa. 210; Hines' Estate, 10 Pa. Superior Ct. 124; McCausland's Estate, 213 Pa. 189; Knecht v. Knecht, 261 Pa. 410; Craig's Estate, 273 Pa. 530.

*Herbert L. Maris,* and with him *Edward J. Kirchner,* for appellee.

OPINION BY KELLER, J., March 2, 1928:

Appellee claims that the decedent was her husband; and the lower court has disallowed the credit taken for payment of collateral inheritance tax and awarded her the entire net balance of his estate on account of her claims for $500 exemption and $5,000 allowance. It is admitted that no marriage ceremony was ever performed and the evidence as to cohabitation and reputation is conflicting. A number of witnesses testified on behalf of the appellee that she and the decedent lived together in the apparent relation of man and wife for a number of years, that they were reputed to be such in the neighborhoods in which they lived or boarded together, that goods were furnished her and charged against her as his wife, and that he had introduced her as his wife to many of their friends and acquaintances; though she admitted that he introduced her to his mother as his sweetheart, and that the old lady never had been informed that they were married, and that at the places where she had worked since her marriage, a laundry and Wanamaker's Store, she had been known as Elsie Hatcher, the name of her former husband from whom she had been divorced on February 23, 1915. On the other hand, it was shown that the decedent was registered as a single man living with his mother or sister, (the administratrix and heir

at law), where it was alleged he maintained his residence and voted in that district; that he passed as a single man and was known as such by his relatives and friends and by his superiors in the Philadelphia Fire Department and the officials of the Philadelphia Fire Department Relief Association, the death benefits from which formed the principal part of his estate. It was also shown that the appellee was registered and had voted under the name of Hatcher.

Notwithstanding the divergent testimony, there was probably sufficient evidence, if believed, to sustain a presumption and a consequent finding that the parties were married, if the evidence had been confined to cohabitation and reputation. But the claimant testified to the precise form of the contract of marriage between her and the decedent, and by this she must stand or fall. If the alleged conversation constitutes a contract of marriage, evidence of cohabitation and reputation is received in corroboration of her testimony that a marriage contract was in fact entered into. But if she herself proves that no valid marriage contract was actually entered into between them, evidence as to cohabitation and reputation goes for nothing: Tholey's App., 93 Pa. 36, 38; Grimm's Est., 131 Pa. 199, 202. As was said by our Supreme Court in Bisbing's Est., 266 Pa. 529, 531, re-affirming Hunt's App., 86 Pa. 294, 297, "Cohabitation and reputation are not marriage; they are but circumstances from which a marriage may be presumed, but such presumption may always be rebutted and will wholly disappear in the face of proof that no marriage in fact had taken place." In that case there was even stronger evidence of that general reputation and cohabitation consistent with the marriage relation referred to as necessary in Patterson's Est., 237 Pa. 24,—that constancy of dwelling, and habit and repute mentioned in Yardley's Est., 75 Pa. 207, 211, 212,—than here, yet it amounted to nothing as against the evidence of the woman herself

establishing that no marriage had in fact taken place.

The testimony of the claimant as to the alleged contract of marriage was as follows: "In 1916 I was living then at a fireman's house; the fireman died and it became necessary that the home be broken up. I had two children to support by a former marriage at that time, and I was rather worried and Mr. Murdock had expressed his feeling to me and I also to him at that time, and I really was sick at the time also and I was not able to work. So we decided, or he decided that he had his mother to keep and she was an awful burden on him at the time, and he thought perhaps he would be able to stay at the sister's house where they then resided; that was in West Philadelphia. He proposed to me would I take him, he asked me did I care for him and I told him I did and I really did, I was sincere. He asked me would I take him and accept him on those terms, he felt if his mother ever found out that there was a marriage contract it would kill her ...... He said, 'Will you be good to me?' I said, 'Yes, I will do everything that a wife is supposed to do.' Well, we just decided then to say we were married and let it go at that." Her subsequent statement on cross-examination, "My only marriage contract was contracted verbally with Mr. Murdock; then we both agreed and entered in that state of man and wife," is evidently only her present explanation of the effect of the conversation between them before quoted.

Do the words testified to by her, as before stated, constitute a valid contract of marriage? In Hantz v. Sealy, 6 Binney 405, 408, Chief Justice TILGHMAN said: "The judge laid down the law correctly. He told the jury that marriage was a civil contract, which might be completed by any words in the present time without regard to form. He told them also, that in his opinion the words proved did not constitute a marriage, and in this I agree with him." In that case the woman

believed herself married, but the marriage was void because the man had a wife living at the time. After a divorce had been secured by the man's legal wife, a lawyer advised the two to celebrate a new marriage. The man said, "I take you for my wife," and the woman on being told that if she would say the same thing the marriage would be complete, answered, "to be sure he is my husband good enough." Chief Justice TILGHMAN says of this, "Now these words of the *woman* do not constitute a present contract, but allude to the past contract, which she always asserted to be a lawful marriage . . . .,. . what was done was too slight and too equivocal to establish a marriage."

This was followed by Com. v. Stump, 53 Pa. 132, where the woman swore that "about thirty-one years since she went to the house of Abraham Stump to live with and keep house for him, under a mutual promise and agreement that they would sustain towards each other the relation of husband and wife, and that they did thus live and cohabit together." The Supreme Court said (Woodward, C. J.) "In our opinion, this was not proof of a marriage in fact. Marriage is in law a civil contract, and does not require any particular form of solemnization before officers of church or state, but it must be evidenced by words in the present tense, uttered with a view and for the purpose of establishing the relation of husband and wife." In Tholey's App., 93 Pa. 36, 38, the court said: "In civil cases, reputation and cohabitation are admitted as evidence of an actual marriage, not as constituting themselves a legal marriage . . . . . . When, however, we have the testimony of one of the parties as to the terms of the contract, and that shows that there was no contract by words *in presenti*, all other evidence on the subject is of no importance."

This was recognized to be the law of Pennsylvania by the Supreme Court of the United States. See Patterson v. Gaines, 6 Howard 550, 587; Maryland v.

Baldwin, 112 U. S. 490, 494, where the court said, (FIELD, J.): "As the case must, for this error, go back for a new trial, it is proper to say that, by the law of Pennsylvania, where, if at all, the parties were married, a marriage is a civil contract, and may be made *per verba de praesenti,* that is, by words in the present tense, without attending ceremonies, religious or civil." See also, Travers v. Reinhardt, 205 U. S. 423, 438.

The rule has been adhered to in more recent cases. In Stevenson's Est., 272 Pa. 291, 300, speaking through Mr. Justice KEPHART, the court said: "Marriage is a civil contract by which a man and a woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge toward each other the duties imposed by law upon such relation. Each must be capable of assenting and must in fact consent to form this new relation . . . . . . Those who, with a clear understanding of what the laws require, embark in undertakings such as those found by the court below, must abide by the consequences of their acts. The court will not relieve them unless it plainly appears there was an actual agreement to form the legal relation of husband and wife." In Craig's Est., 273 Pa. 530, 533, speaking through Mr. Justice FRAZER, the court said: "These principles are well settled. Marriage is a civil contract and does not require a particular form of solemnization by church or state officials to make it valid; but as a contract it must be evidenced by words in the present tense uttered with a view to establish the relation of husband and wife." In McDevitt's Est., 280 Pa. 50, 51, the court said: "There was no ceremonial marriage, nor proof of a contractual one, written or oral. The only evidence is that he promised to marry her, which is not marriage, although its breach might sustain an action for damages. The question here is not whether these parties were engaged, but whether

they were married, and of the latter there was no proof. There was abundant evidence of cohabitation and some of reputation, which combined might tend to create a presumption of marriage, but are worthless here in the face of appellant's own testimony that there never was a marriage." And in Edwards v. Enterprise Mfg. Co., 283 Pa. 420, the last deliverance we have found on the subject, it was held, in a per curiam opinion that, "The admission of claimant, as in McDevitt's Estate, that there was no marriage ceremony or contract of marriage made per verba de praesenti was fatal to her claim."

The same rule prevails in this court. In Com. v. Haylow, 17 Pa. Superior Ct. 541, 547, speaking through President Judge RICE, the court said: "With us marriage is a civil contract, which may 'be completed by any words in the present time without regard to form' (Hantz v. Sealy, 6 Bin. 405), the essential to its validity being the consent of the parties able to contract." See also Com. v. Murtagh, 1 Ashmead 272, 274, where the subject was discussed by "that very learned judge, President KING." There is only one case in the Supreme Court Reports in which there is any apparent departure from the rule requiring "words in the present time" or, *verba de praesenti,* to constitute a valid contractual marriage, and that is, Richard v. Brehm, 73 Pa. 140. In the opinion in that case Mr. Justice MERCUR said: "Marriage is a civil contract *jure gentium,* to the validity of which the consent of parties, able to contract, is all that is required by natural or public law. If the contract is made *per verba de praesenti,* though it is not consummated by cohabitation, or if it be made *per verba de futuro,* and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary: 2 Greenl. Evid. Sec. 460. Marriage is a civil contract which may be completed by any words in the present time, without regard to form:

Hantz v. Sealy, 6 Binney 405." The reference to contracts made *'per verba de futuro,'* if followed by consummation, was not necessary to the case, for the court found there was evidence before the jury from which they might have found a valid marriage contract had been entered into, and held that certain evidence which had been excluded should have been admitted. The extract is quoted from Greenleaf on Evidence (Vol. 2, Sec. 460) and is based on a statement from Kent's Commentaries, (Vol. 2, p. 87). A number of American cases are cited in the notes to Greenleaf as supporting the statement,* but none of them was concerned with contracts entered into *per verba de futuro,* but only with contracts *per verba de praesenti.* In so far as it relates to contracts *per verba de futuro,* followed by consummation, the doctrine states the rule of the ancient canon law, (18 R. C. L. 393, Sec. 14; Bouvier's Law Dictionary (Rawle's Ed.) Vol. 2, p. 2100; Dalrymple v. Dalrymple, 2 Haggard's Consistory Reps. 54, 64), which, being the law of the church, was primarily interested in the legitimacy of the children resulting from such a relation. (See the differences between the common law and the canon law as to the legitimacy of children whose parents intermarried after their birth: 1 Blackstone's Commentaries, 19 and 454). Most of the English as well as the American cases cited by Chancellor KENT in support of the statement likewise were concerned only with contracts entered into *per verba de praesenti.* Such was the case as respects Bunting v. Lepingwell, 4 Coke 29; Lautour v. Teesdale, 8 Taunton 830; Ross v. Clark, 8 Paige 574, 580; State v. Patterson, 2 Iredell (N. C.) 346, 356. In Jesson v. Collins, Holt 457, s. c. Salk. 437, Lord Chief Justice HOLT said, "A contract per verba de praesenti is a marriage, viz., I marry you, you and

---

* Fenton v. Reed, 4 Johnson 52; Jackson v. Winne, 7 Wend. 47; Hallet v. Collins, 10 How. (U. S.) 174; Clayton v. Wardell, 4 Comst. (N. Y.) 230.

I are man and wife: and this is not releasable. Per verba de futuro, I will marry you, I promise to marry you, etc., is releasable." See also, Collins v. Jesson, Holt 458. In Rex v. Brampton, 10 East 282, Lord ELLENBOROUGH said: "Now certainly a marriage *per verba de praesenti* would have bound the parties before that act" [the Marriage Act of 26 George II, c. 23].

In this country the doctrine of the canon law, that a contract per verba de futuro followed by consummation constituted a marriage, has not been generally followed. In Cheney v. Arnold, 15 N. Y. 345, the Court of Appeals of New York, (Denio, C. J.) considered it at great length, and though expressing respect for their opinions, disapproved the statement of the law as contained in Kent's Commentaries and Greenleaf on Evidence, and the dictum of COWEN, J. in Starr v. Peck, (1 Hill 224), in consonance with them, and held that a contract to marry *per verba de futuro*, though followed by cohabitation, did not amount to a marriage in fact; that the doctrine of the canon law did not become the law of New York by force of its adoption of the common law of England, for it was not a part of that common law. To the same effect see Duncan v. Duncan, 10 Ohio St. 181, 183, in which the statement from Kent and Greenleaf is considered and disapproved; Town of Londonderry v. Town of Chester, 2 N. H. 268, 279; and see note to Grigsby v. Reib, L. R. A. 1915 E, pp. 8-33; and cases cited in note (2) to 18 R. C. L. p. 391, Sec. 12. In Jewell's Lessee v. Jewell, 1 Howard (U. S.) 219, 233, 234, the Supreme Court of the United States was equally divided on the point whether the quotation from Greenleaf was a correct statement of the law and refused to give an opinion on the subject. If the rule of the ancient canon law should be in force in Pennsylvania it is difficult to see how any one but a married man could be convicted of seduction under promise of mar-

riage, (Act of March 31, 1860, P. L. 394, Sec. 41), for
in such case as to single men the promise to marry
(*per verba de futuro*) followed by consummation (*cum
copula*) would constitute a marriage, not a seduction.

While the case of Richard v. Brehm has been cited
with approval by our Supreme Court on other points,
a somewhat careful review of its decisions has failed
to disclose to the writer one other case in which it has
been held by that court that a contract *per verba de
futuro* followed by consummation constitutes a valid
marriage. Had it been so, a different decision would
have been required in Grimm's Est., 131 Pa. 199;
Stevenson's Est., 272 Pa. 291; Craig's Est., 273 Pa.
530; and McDevitt's Est., 280 Pa. 50, for in all of them
it was testified, and practically admitted, that there
was a promise of marriage followed by consumma-
tion, and in some instances, by long continued cohabi-
tation. It is true that in Comly's Est., 185 Pa. 208,
the fourth syllabus reads, ''Where words in futuro in
a contract to marry are followed by cohabitation, the
contract is executed and the marriage is valid,'' but
there is nothing in the opinion of the Supreme Court
to justify it. The statement occurs in the opinion of
the lower court, (p. 211), and was not referred to or
adopted by the Supreme Court and was not the point
decided, for the lower court held that the words spoken
between the parties could be construed as constituting
a present contract, and the Supreme Court affirmed it
on the ground that there was evidence to support such
a finding, saying: ''The marriage set up was not
solemnized in the usual manner, but was entered into
by a verbal contract made, as is alleged, between the
claimant and Comly that they would take each other
for husband and wife respectively, until death should
separate them.''

We are of opinion that the rule enunciated by Chief
Justice TILGHMAN in 1814, (Hantz v. Sealy), reiter-
ated in 1866 (Com. v. Stump), and in 1880 (Tholey's

App.) subsequent to Richard v. Brehm, and while Mr. Justice MERCUR was a member of the court, and restated in 1922 (Craig's Est.) and 1925 (Edwards v. Enterprise Mfg. Co.) is still the law of Pennsylvania, viz., that to constitute a valid marriage in this State there must be a contract *per verba de praesenti,* uttered with a view to establish the relation of husband and wife.

Judged by this standard, we are of opinion that the words which passed between the claimant and decedent did not constitute a contract of marriage. They are no stronger than several of the cases hereinbefore referred to which were held insufficient. There seems to have been a proposal or an asking on the part of decedent whether the claimant would take him and "accept him on those terms"—apparently that his mother must not know the relation between them—and whether she would be good to him; to which she replied, "Yes, I will do everything that a wife is supposed to do," and then—"Well, we just decided then to say we were married and let it go at that." There is no averment that they did marry each other by words in the present tense, no taking of her by him as his wife and of him by her as her husband, but, "we just decided then to *say* we were married and let it go at that"—an agreement to *call* themselves married for the purpose of living together rather than an actual marriage. It is not as strong or explicit as in Hantz v. Sealy, supra, but is about the same as in Com. v. Stump, supra, where the woman went to live with the man "under a mutual promise and agreement that they would sustain towards each other the relation of husband and wife" and did thus live and cohabit together.

The claimant when she went to live with the decedent was not a young girl but a mature woman, who had already been married, and had two children, and who knew how such a contract is entered into. If she

lived with the decedent without any ceremony or any contract of marriage per verba de praesenti, she assumed no obligations of a wife and acquired no rights as such, and is not entitled to the benefits conferred on a wife by the laws of the Commonwealth.

The assignments of error are sustained. The decree is reversed and the record is remitted to the court below to report distribution in accordance with this opinion.